SUPERIOR COURT 
 
 COMMONWEALTH v s. ASHLEY RYAN

 
 Docket:
 24-145
 
 
 Dates:
 January 3, 2025
 
 
 Present:
 Peter B. Krupp Justice of the Superior Court
 
 
 County:
 NORFOLK
 

 
 Keywords:
 MEMORANDUM AND ORDER ON MOTION TO DISMISS COUNT SEVEN
 
 

             Defendant Ashley Ryan delivered a stillborn child after using illegal drugs (cocaine and fentanyl) through much of her pregnancy, including on the day of her delivery. Among other offenses, the Commonwealth has charged her with reckless endangerment of a child in violation of G.L. c. 265, § 13L (Count 7). In defending this novel charging decision, the Commonwealth contends that a “viable fetus” is a “child” under § 13L, at least when the fetus is delivered stillborn. Defendant challenges that construction by motion under Commonwealth v. McCarthy (“McCarthy”), 385 Mass. 160 (1982), arguing that § 13L does not apply to an unborn child and, even if it did, the grand jury did not hear sufficient evidence that the fetus was “viable.” Principally because that § 13L does not apply to the alleged conduct at issue, the motion must be allowed.
FACTUAL BACKGROUND
            A.  The Evidence Before the Grand Jury
            The grand jury heard testimony that on March 24, 2024, the Foxborough Police received a call about a woman (defendant), who was giving birth to a child without many signs of life at the Sonesta Select Hotel in Foxborough. Defendant and co-defendant Christopher Forgette (“Forgette”) had been staying at the hotel together. The initial responders saw powder that tested
 
                                                            -1-
 
positive for fentanyl and cocaine in the room where the delivery occurred. A subsequent search of the hotel room revealed a portable safe containing pills and over 300 grams of a white powder containing fentanyl. Also found in the hotel room was cocaine, Gabapentin, more than $4,000 in cash, digital scales, and multiple cellular phones.
            The child was stillborn and transported to Sturdy Memorial Hospital. Medical records provided to the grand jury indicated the child weighed 5 lbs. and was 19 inches long. An autopsy concluded that the child was deceased when it was delivered and that “it was likely dead for a few hours or more before it was birthed.”
            At the hotel room and later at the hospital, defendant gave inconsistent statements about the progression of her pregnancy. Defendant told fire department employees that responded to the hotel room that “she thinks” she was two weeks past her due date and also that she was 35 weeks pregnant. She told one doctor at Sturdy Memorial Hospital that she went for an abortion appointment one month before, when she was approximately 27 weeks pregnant. The doctor who examined the stillborn child at Sturdy Memorial, estimated the gestational age as approximately 34 weeks.
            Forgette told the police that defendant had decided to have the baby and was planning to go to a hospital in Providence to deliver the baby. In his recorded statement, he said he did not know how far along defendant’s pregnancy was, but that she had been told at one hospital that her due date was February 28 and at another that her due date was March 24 or 25. He also told police that defendant told him on March 24, 2024, that she had felt the baby moving “last night.”
            The grand jury heard testimony that defendant was taking multi-vitamins during her pregnancy, she had gone to seek an abortion but had not followed-up, and she had not received any prenatal care. Defendant admitted to using narcotics throughout the pregnancy, including the
 
                                                            -2-
 
night before her delivery, and admitted to using fentanyl, Xanax and Klonopin on the day of the delivery. Health care providers and police observed defendant to be “extremely intoxicated” or “under the influence of a controlled substance” at Sturdy Memorial Hospital. According to Forgette, defendant was a daily drug user. First responders treating defendant were unable to place an intravenous (“IV”) line due to scar tissue from defendant’s suspected IV drug use.
            The grand jury heard no testimony about the short-term or long-term effects of fentanyl or any other narcotics on a gestating fetus.[1] There was no medical or other testimony about whether, given defendant’s substantial drug use, the fetus was viable in March 2024; nor was there evidence about when the fetus was viable.
            B.  The Pending Charges
            Defendant is charged with trafficking 200 grams or more of fluorofentanyl (Count 1), and fentanyl (Count 2); unlawful possession of fentanyl (Count 3), cocaine (Count 4), Gabapentin (Count 5), and Clonazepam (Count 6); and reckless endangerment of a child (Count 7). Only Count 7 is at issue in the motion before me.
            Count 7 alleges in relevant part that, “on or about and between March 23-24, 2024” in Foxborough, defendant “did wantonly or recklessly engage in conduct that creates a substantial risk of serious bodily injury . . . to a child or wantonly or recklessly fails [sic] to take reasonable steps to alleviate such risk where there is a duty to act, in violation of M.G.L. c.265, § 13L.” Although the indictment does not contain a “to wit” clause and does not specifically allege what act or acts constituted the alleged violation, by alleging the crime occurred “on or about and
 
--------------------------------------------
 
            [1]        Massachusetts State Police Sergeant Keith Pantazelos, a narcotics case supervisor, testified that fentanyl is “potent,” but did not offer any information about its effects on a developing or potentially viable fetus.
 
                                                            -3-
 
between March 23-24, 2024,” the Commonwealth clearly relies on defendant’s ingestion of drugs immediately prior to her delivery.
DISCUSSION
            Defendant primarily challenges the scope of the reckless endangerment statute to the facts of this case, and alternatively challenges the adequacy of the evidence presented to the grand jury. I address these arguments in turn.
I.  Reckless Endangerment of a Child
            The crime of reckless endangerment of a child was enacted in 2002. The statute defines a “[c]hild” as “any person under 18 years of age,” and provides that “[w]hoever wantonly or recklessly engages in conduct that creates a substantial risk of serious bodily injury or sexual abuse to a child, or wantonly or recklessly fails to take reasonable steps to alleviate such risk where there is a duty to act shall be punished.” G.L. c. 265, § 13L. As the Supreme Judicial Court (“SJC”) has described,
[t]he elements of § 13L are (1) a child under age eighteen, (2) a substantial risk of serious bodily injury or sexual abuse, and (3) the defendant wantonly or recklessly (I) engaged in conduct that created the substantial risk, or (ii) failed to take reasonable steps to alleviate that risk where a duty to act exists.
Commonwealth v. Coggeshall, 473 Mass. 665, 667-668 (2016), citing Commonwealth v. Roderiques, 462 Mass. 415, 422 (2012). The Commonwealth does not have to prove that injury actually occurred, I d. at 423; only, in relevant part, that there was a “substantial risk of serious bodily injury.” G.L. c. 265, § 13L. “‘[S]ubstantial risk’ means ‘a good deal more than a possibility,’” where the “‘disregard of the risk constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation’ [and] ‘substantially more than 
 
                                                            -4-
 
negligence.’” Coggeshall, 473 Mass. at 668, quoting Commonwealth v. Hendricks, 452 Mass. 97, 103 (2008).
            The crime of reckless endangerment of a child is a creature of statute. As a result, although it draws in part from the common law (e.g. the definition of “wanton or reckless”), the statute also imposes additional requirements that are not required by the common law (e.g. defendant’s actual awareness of the risk). Commonwealth v. Hardy, 482 Mass. 416, 421-422 (2019) (comparing wanton or reckless conduct constituting manslaughter to that required for reckless endangerment).
            A. W hen a Viable Fetus May Be Considered a Child
            The parties have not identified, and I have not located, any reported case holding that a “child” under the reckless endangerment statute includes a viable fetus. Nor have I found any case in which the associated crime of assault and battery upon a child has been construed to apply to a fetal victim. See G.L. c. 265, § 13J (defining “child” as “any person under fourteen years of age”).
            In limited contexts – specifically, in homicide and wrongful death cases – the SJC has held that a “person” may include a viable fetus, such that a third-party may be held criminally or civilly responsible for the death of an unborn child. It bears discussing the history of that jurisprudence. In Mone v. Greyhound Lines, Inc., 368 Mass. 354 (1975), the SJC unanimously held that a driver who negligently struck a vehicle carrying a woman who was 8½ months pregnant, causing the death her viable fetus, could be held liable for the death of a “person” under the wrongful death statute. Id. at 360-361, citing G.L. c. 229, § 2. Mone reversed Leccese v. M cDonough, 361 Mass. 64, 67 (1972), which had held that no cause of action existed on behalf of a stillborn fetus and that any change to such a rule should be left to the Legislature.
 
                                                            -5-
 
Mone, 368 Mass. at 356. Because of the common law roots of the wrongful death statute, the court in M one felt it could alter its interpretation of the wrongful death statute rather than wait for the Legislature, particularly where such changes were “not a drastic or radical incursion upon existing law and would not seriously impair an existing interest, disappoint an expectation, or defeat a reliance.” 368 Mass. at 358-359 (internal quotations omitted).
            In Commonwealth v. Cass, 392 Mass. 799 (1984), in a split 4-3 decision, the SJC held that a defendant could be charged with “caus[ing] the death of a person” under the motor vehicle homicide statute, G.L. c. 90, § 24G(b), after he struck a pedestrian who was 8½ months pregnant and caused the death of the fetus. 392 Mass. at 799-801. The court reasoned that the statute did not define the term “person,” and the Legislature enacted the statute the year after the decision in Mone but gave no indication that it sought to depart from Mone.[2] I d. at 800-801.
            Following Cass, the SJC has upheld homicide convictions where a third-party’s violent act against a pregnant woman caused the death of her viable fetus. See, e.g., Commonwealth v. Ronchi, 491 Mass. 284, 296-298 (2023) (murder); Commonwealth v. Crawford, 430 Mass. 683, 687 (2000) (involuntary manslaughter); Commonwealth v. Lawrence, 404 Mass. 378, 383-384 (1989) (involuntary manslaughter). In so doing, the court has relied on the fact that the Legislature has predominantly left the definitions of manslaughter and murder for the courts. Crawford, 430 Mass. at 688. See Lawrence, 404 Mass. at 384 (“our reasoning in Cass . . . is equally applicable to the common law crime of murder”).
 
--------------------------------------------
 
            [2]        The majority in Cass acknowledged that it was departing from “the established common law in every American jurisdiction that has considered the question” that the object of a homicide must be a person born alive, 392 Mass. at 805, but concluded that “the Legislature has given no hint of a contemplated distinction between pre-born and born human beings . . . and no good reason for such an arbitrary distinction is apparent.” Id. at 801. “If a person were to commit violence against a pregnant woman and destroy the [viable] fetus within her, we would not want the death of the fetus to go unpunished.” Id. at 807.
 
                                                            -6-
 
            Although these cases reject a distinction between born and viable unborn victims, not only do they arise in the context of construing common law crimes and common law concepts, they also are specific to third-party assailants. In contrast, where a civil claim or criminal charge concerns the acts of an expectant mother, the SJC has had a different view, recognizing “inherent and important differences between a fetus, in utero, and a child already born, that permit[ ] a bright line to be drawn around the zone of potential [ ] liability of one who is still biologically joined to an injured [party].” Commonwealth v. Pugh, 462 Mass. 482, 506 (2012), quoting Remy v. MacDonald, 404 Mass. 675, 683 (2004).
            In P ugh, the court held that a defendant-mother could not be guilty for involuntary manslaughter based on her attempt to give birth unassisted and her failure to call for medical assistance. 462 Mass. at 484. Although a parent may be subject to criminal liability for failing “to provide medical services to their independently living children,” id. at 494 (emphasis added), the court held that imposing a similar duty on an expectant mother would constitute “a significant incursion on a birthing woman’s liberty interest in freedom from an unwarranted degree of government surveillance and coercion.” Id. at 506-507. The court wrote:
Pregnancy presents a unique circumstance because anything which a pregnant woman does or does not do may have an impact, either positive or negative, on her developing fetus . . . Drawing the line between what is lawful and what is criminal conduct on the part of pregnant women and women in labor would be left to individual law enforcement officials and judges.
Id. at 508 (internal quotation and citation omitted). Accord Remy, 404 Mass. at 678 (imposing tort duty of reasonable care on a pregnant person with regard to her fetus “would present an almost unlimited number of circumstances that would likely give rise to litigation”). The court in Pugh held that the reasoning in Remy was equally applicable to preclude criminal liability for unintentional harm. 462 Mass. at 509. To subject such decisions to criminal liability would risk
 
                                                            -7-
 
outlawing constitutionally protected conduct and “creat[e] impermissible uncertainty as to just what conduct is and is not” prohibited.[3] P ugh, 462 Mass. at 509 (citations omitted).
            B. A Viable Fetus is Not a “Child” under Section 13L
            Against this backdrop, the Commonwealth has charged defendant with reckless endangerment of her unborn fetus based upon her use of illicit drugs on March 23-24, 2024. Whether G.L. c. 265, § 13L, criminalizes such conduct is a question of legislative intent. Cass, 392 Mass. at 800. For a number of reasons, I conclude that the statutory definition of “child” does not include a viable fetus.
            First, as noted, the caselaw available to support the Commonwealth’s position concerns homicide charges against third-parties. I am not aware of any precedent for charging a defendant-mother with reckless endangerment of a viable fetus or for assault and battery on a child for an unintentional offense against a fetus.[4] In contrast to homicide crimes, “[r]eckless endangerment of a child . . . is a crime created by the Legislature.”[5] Hardy, 482 Mass. at 421.
 
--------------------------------------------
 
            [3]        In P ugh, the court also expressed concern about the substantial risk of inequitable and disparate enforcement of a “broad and ill-defined duty” of a pregnant person to an unborn fetus: “[P]regnancy does not come only to those women who have within their means all that is necessary to effectuate the best possible prenatal environment . . . Women in all circumstances
give birth: the well-educated and the ignorant; the rich and the poor; those women who have access to good health care and good prenatal care and those who, for an infinite number of reasons, have not had access to any health care services . . . [T]he imposition of criminal liability
on a woman in labor for breach of the duty at issue here is likely to have the greatest impact on the most vulnerable groups of pregnant women.” P ugh, 462 Mass. at 509-510 (internal quotations and citations omitted).
            [4]        “[C]riminal liability may be imposed on a person – whether a woman in the late stages of pregnancy, a physician, or a third party – who intentionally kills a viable fetus.” Pugh, 462 Mass. at 505. No such intent is alleged here.
            [5]        Compare Coggeshall, 473 Mass. at 670 (§ 13L evinces “a clearly expressed legislative intent to depart from the common-law meaning of the words ‘wanton or reckless’”), with C ass, 392 Mass. at 802 (“The reports are replete with our common law decisions defining the terms ‘murder and ‘manslaughter’ as used in homicide statutes.”).
 
                                                            -8-
The Legislature knows how to write statutes designed to address pregnancy and the impact to a fetus.[6] While not dispositive, the fact that the Legislature has enacted statutes specifically addressing third-party assaults on pregnant women, see, e.g., G.L. c. 265, § 13A(b)(ii) (assault and battery “upon another who is pregnant”), 15A(c)(ii) (assault and battery by means of a dangerous weapon “upon another who is pregnant”), strongly suggests that it knew how to write the reckless endangerment statute more clearly if it intended the term “child” to include a viable fetus.
            Second, interpreting G.L. c. 265, § 13L, to apply to an unborn fetus would create a discontinuity within the statute. Section 13L is directed at “conduct that creates a substantial risk of serious bodily injury or sexual abuse to a child.” (Emphasis added). As it would be impossible to sexually abuse a child in utero, the reference to “sexual abuse” suggests that “child” refers to an independently living person.
            Third, although a defendant’s use of illicit drugs while pregnant may be worthy of greater criticism than the decision not to call for medical assistance at issue in Pugh, imposing criminal liability under G.L. c. 265, § 13L, for injury to an unborn fetus because of the mother’s ingestion of illegal drugs would present the same, if not greater, risks of disparate enforcement as those discussed in Pugh. Section 13L criminalizes “wanton[ ] or reckless[ ] . . . conduct that [merely]
 
--------------------------------------------
 
            [6]        The Legislature has enacted a number of criminal and regulatory statutes concerning maternity and fetal care. See, e.g., G.L. c. 119, § 51A(a) (mandated reporter’s duty arises on reasonable belief “that a child is suffering . . . injury from: . . . (iii) physical dependence upon an addictive drug at birth”); G.L. c. 38, § 3 (person with knowledge must report to chief medical examiner’s office “death where suspicion of abuse of child” under subsection 8, and “fetal death” under subsection 14); G.L. c. 112, § 12M (listing medical providers who may perform an abortion after 24 weeks); G.L. c. 112, § 12J (making it a crime to use “any live human fetus” for “scientific, laboratory, research of other experimentation”); G.L. 112, § 12N (making it a crime to perform an abortion after 24 weeks except “to preserve the life of the patient” or for other specified reasons); G.L. c. 112, § 12L (barring the Commonwealth from interfering “with a person’s personal decision and ability to prevent, commence, terminate or continue their own pregnancy”).
 
                                                            -9-
 
creates a substantial risk of serious bodily injury or sexual abuse to a child.” G.L. c. 265, § 13L (emphasis added). Neither harm, nor intent to harm, are required. Applying the statute to the relationship between an expectant mother and her unborn child would invite government intrusion and surveillance into virtually every aspect of the pregnancy, and subject “every decision a woman makes during her pregnancy, medical or otherwise” to the possibility of prosecution.[7] See Pugh, 462 Mass. at 508. As the SJC recognized:
A pregnant woman may place her fetus in danger by engaging in activities involving a risk of physical harm or by engaging in activities, such as most sports, that are generally not considered to be perilous. A pregnant woman may jeopardize the health of her fetus by taking medication (prescription or over-the-counter) or, in other cases, by not taking medication.
Id., quoting Remy, 404 Mass. at 678.
            Fourth, applying the reckless endangerment statute to an unborn fetus, as it has been applied to living children, would invariably infringe the rights of pregnant women to engaged in constitutionally protected activity, and invite disparate and unpredictable enforcement. See, e.g., Commonwealth v. Barlow-Tucker, 493 Mass. 197, 205-208 (2024) (failure to seek medical attention beyond over-the-counter treatments for infant with fluctuating fever, persistent cough, lethargy, and dehydration supported charge under § 13L); Coggeshall, 473 Mass. at 669-671 (walking with 11-year-old along railroad tracks supported § 13L charge). Could, for example, an expectant mother be criminally liable to failing to leave an abusive relationship? Cf. Roderiques, 462 Mass. at 425 (defendant could be culpable under G.L. c. 265, §§ 13J or 13L, for allowing
 
--------------------------------------------
 
            [7]        Several states have held that prosecuting a pregnant woman for endangering a child based on illicit drug use while pregnant, at least without sufficient notice that such conduct is prohibited, violates due process. See, e.g., State v. Martinez, 137 P.3d 1195, 1197–98 (N.M. Ct. App. 2006) (and cases cited); Collins v. State, 890 S.W.2d 893, 898 (Tex. App. 1994); State v. G ray, 584 N.E.2d 710, 711 (Ohio 1992) (and cases cited); State v. Luster, 204 Ga. App. 156, 156-159 (1992).
 
                                                            -10-
 
boyfriend to assault child). Even if the scope of a pregnant person’s liability for reckless endangerment was limited to otherwise illicit conduct, the statute could still subject minor transgressions (e.g., jaywalking, speeding, driving without a seatbelt) to up to 2½ years of imprisonment. The liability the Commonwealth seeks to impose here “would be impossible to cabin[,] and would be highly susceptible to selective application.” Pugh, 462 Mass. at 508.
            Fifth, at oral argument, the Commonwealth contended that, even if the term “child” in the mine-run of scenarios that might be charged under the reckless endangerment statute would not include a viable fetus, the term does include a viable fetus where, as here, the fetus was stillborn and therefore the law related to homicide should apply. I am not persuaded. If the Commonwealth wanted to invoke the common law notion of “child” as found by the SJC in the context of third-party actions that result in the death of a viable fetus, it could have charged defendant with the common law crime of involuntary manslaughter, assuming such a charge could be asserted after Pugh. It did not. The Commonwealth’s argument that “child” should mean one thing if death occurs, but something else if it does not, flies in the face of the language of G.L. c. 265, § 13L. See Cass, 392 Mass. at 804 (court’s interpretation must be within “the limits permitted by statutory language”). The definition of the term “child” under § 13L cannot plausibly turn on the extent of the resultant injury; particularly in the context of a statute where injury is not even an element of the offense.
            Lastly, the reckless endangerment statute does not exist in isolation; instead, it is part of a mosaic of criminal and administrative statutes which have been laid out to protect children from abuse and neglect. See, e.g., G.L. c. 18B, G.L. c. 18C, G.L. c. 119. Chapter 119, for example, establishes procedures for reporting and investigating allegations of abuse and neglect of a “child,” see generally G.L. c. 119, § 1, et seq., and, like the reckless endangerment statute,
 
                                                            -11-
 
defines “child” as “a person under the age of 18.” G.L. c. 119, § 21. Under that statute, upon reasonable belief that “a child’s health or safety is in immediate danger from abuse or neglect,” the Department of Children and Families (“DCF”) is required to “take [the] child into immediate temporary custody” if removal is necessary to prevent such abuse and neglect. G.L. c. 119, § 51B(c). If a “person under the age of 18” included an unborn viable fetus, DCF would have a statutory obligation to take action if a fetus is in danger of abuse and neglect, an action DCF could not plausibly, much less constitutionally, fulfill.[8]
            There is no suggestion that, in enacting G.L. c. 265, § 13L, or any of the child protection laws, that the Legislature intended to require policing and surveillance of pregnancies. I cannot interpret § 13L to produce such an illogical result.” Commonwealth v. Vega, 449 Mass. 227, 233 (2007). As the P ugh court noted, “existing criminal laws proscribing murder, most late-term abortions, and the neglect and abuse of children appropriately protect the State’s interests in safeguarding viable fetuses and living children [respectively].” 462 Mass. at 484. Because a “viable fetus” is not a “person” under the reckless endangerment statute, Count 7 must be dismissed.
II.  The McCarthy Challenge – Adequacy of Evidence
            Count 7 must also be dismissed for a second reason. Even if a “viable fetus” may be a “person” under § 13L, the Commonwealth failed to introduce evidence before the grand jury to
 
--------------------------------------------
 
            [8]        Similarly, G.L. c. 119, §§ 21 and 51A, designate various caregivers, medical providers, counselors, educators, and other professionals as “mandated reporters” who, under threat of criminal penalty, are required to report abuse or neglect of a child where there is reasonable cause to do so. To hold that a pregnant person may be held criminally liable for creating a substantial risk of harm to a viable fetus – i.e., a viable fetus is a “child” under § 13L – would suggest that mandated reporters have a duty to report such actions as well. The rippling ramifications would be profound, unforeseen, and contrary to good public policy. For example, if a pregnant woman addicted to illegal narcotics were to seek medical care for her addiction, would a mandated reporter be required to report her to DCF for abuse of a child, or report her to law enforcement for violating § 13L?
 
                                                            -12-
 
establish probable cause to believe that the fetus was viable during the period charged, i.e., “on or about and between March 23-24, 2024,” or how or whether defendant’s ingestion of illicit substances created a substantial risk to her unborn baby.
            It is well established that a grand jury must hear evidence sufficient to establish probable cause on each element of a charged offense. McCarthy, 385 Mass. at 163. See Commonwealth v. Martinez, 104 Mass. App. Ct. 13, 15 (2024). Although “a decidedly low standard,” Commonwealth v. Barbosa, 477 Mass. 658, 675 (2017), quoting Commonwealth v. Hanright,
466 Mass. 303, 311 (2013), probable cause is “reasonably trustworthy information,” which may include hearsay, “sufficient to warrant a prudent [person] in believing that the defendant [ ] committed” the offense. Hanright, 466 Mass. at 311-312, quoting Commonwealth v. Stevens, 362 Mass. 24, 26 (1972). See Commonwealth v. Rakes, 478 Mass. 22, 29-30 (2017); Commonwealth v. Stevenson, 474 Mass. 372, 376 (2016).
            Here the grand jury heard no evidence about the condition of the fetus in utero. To be sure, the grand jury heard that defendant felt the baby move the day before her arrest, and heard various estimates of the baby’s gestational age. But the grand jury also heard extensive evidence about defendant’s long-term, daily drug use over the course of her pregnancy. It is the stuff of “[m]edical science” to “provide competent proof” about the viability of a fetus and whether a person’s actions caused a particular injury or risk of injury.[9] See Cass, 392 Mass. at 806. Here, the grand jury heard no competent evidence to establish that the fetus was viable during the period charged (March 23-24, 2024), or that defendant’s ingestion of drugs on March 23-24, 2024 caused injury or posed a substantial risk of serious bodily injury to the then-unborn fetus.
 
--------------------------------------------
 
            [9]        See, e.g., P ugh, 462 Mass. at 501 (conviction independently vacated because insufficient evidence that defendant’s actions or inactions caused fetal death).
 
                                                            -13-
 
ORDER
Defendant’s Motion to Dismiss Count Seven (Docket #24) is ALLOWED.